IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COLLEEN L.[1]                          :           CIVIL ACTION
                                       :
        v.                             :
                                       :
FRANK BISIGNANO,                       :           NO.  23-2818
Commissioner of Social Security        :

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                    July 16, 2025

Plaintiff seeks review of the Commissioner's decision denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI"). For the reasons that follow, the decision of the Administrative Law Judge ("ALJ") is reversed and the matter is remanded for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

I.      **PROCEDURAL HISTORY**

Plaintiff filed her applications on January 10, 2019, tr. at 189-90, 483-88, 489-95, alleging disability from March 5, 2017, as a result of osteoarthritis, anxiety, depression, bipolar disorder, drug addiction, post-traumatic stress disorder, and underactive thyroid. Tr. at 562.[2] Her applications were denied initially, id. at 189-90, and on reconsideration,

_____

[1]Consistent with the practice of this court to protect the privacy interests of plaintiffs in social security cases, I will refer to Plaintiff using her first name and last initial. See Standing Order – In re: Party Identification in Social Security Cases (E.D. Pa. June 10, 2024).

[2]For purposes of SSI, the earliest month for which benefits can be paid "is the month following the month [the claimant] filed the application," if the claimant meets all the other requirements for eligibility. 20 C.F.R. § 416.335. To be entitled to DIB, Plaintiff must establish that she became disabled on or before her date last insured. Id.

id. at 266-68, 269-72, and she requested an administrative hearing.  Id. at 273.  After

holding a hearing on November 6, 2020, id. at 135-59, the ALJ issued an unfavorable

decision on December 15, 2020.  Id. at 226-41.  On July 19, 2021, the Appeals Council

vacated the ALJ's decision and remanded with instructions to allow Plaintiff the

opportunity to cross-examine the medical expert whose interrogatory responses were

received after the November 2020 hearing and before the December 2020 unfavorable

decision.  Id. at 250-51.

On remand, the ALJ held hearings on Plaintiff's applications on November 4,

2021, tr. at 103-34, and February 24, 2022, id. at 60-102,[3] and issued a second

unfavorable decision on June 22, 2022.  Id. at 15-49.  The Appeals Council denied

Plaintiff's request for review on May 30, 2023, id. at 1-3, making the ALJ's June 22,

2022 decision the final decision of the Commissioner.  20 C.F.R. §§ 404.981, 416.1481.

Plaintiff sought review in this court on July 25, 2023, Doc. 1, and the matter is

fully briefed and ripe for review.  Docs. 9-11.[4]

---

§ 404.131(b).  The Certified Earning Record indicates and the ALJ found that Plaintiff
was insured through September 2017.  Tr. at 16, 502.

[3]At the November 4, 2021 hearing on remand, the ALJ explained that the medical
expert who was integral to the Appeals Council's remand order was no longer providing
medical expert testimony.  Tr. at 108.  As a result, Plaintiff requested a supplemental
hearing with a different medical expert, and the ALJ granted the request.  Id. at 109-10,
133.

[4]Plaintiff's reply brief was docketed twice.  Docs. 11 & 12.  The parties have
consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  See Standing
Order – In Re: Direct Assignment of Social Security Appeals to Magistrate Judges –
Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Doc. 6.

## II.  <u>LEGAL STANDARD</u>

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusion that Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla."  <u>Zirnsak v. Colvin</u>, 777 F.2d 607, 610 (3d Cir. 2014) (quoting <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 552 (3d Cir. 2005)); <u>see also</u> <u>Biestek v. Berryhill</u>, 587 U.S. 97, 103 (2019) (substantial evidence "means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'") (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).  The court has plenary review of legal issues.  <u>Schaudeck</u>, 181 F.3d at 431.

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process, evaluating:

> 1.  Whether the claimant is currently engaged in substantial gainful activity;
>
> 2.  If not, whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities that has lasted or is expected to last for a continuous period of 12 months;

      3.      If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;

      4.      If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and

      5.      If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R. § 416.920(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of her age, education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

## III.   DISCUSSION

### A.   ALJ's Findings and Plaintiff's Claims

In her June 22, 2022 decision, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since March 5, 2017, the alleged onset date.  Tr. at 19.  At step two, the ALJ found that Plaintiff suffers from the severe impairments of disorders of the lumbar spine with ganglion cyst, bilateral knee disorders, bilateral hip disorders, status post right hip replacement, left foot and ankle disorder, obesity, depressive disorders, anxiety disorder, trauma and stressor related disorder, and substance

4

use disorder.  Id.  The ALJ further found that Plaintiff's assessed hypothyroidism, hepatitis C, obstructive sleep apnea, and vision and dental impairments were not severe. Id. at 19-20.  At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the Listings.  Id. at 20.

The ALJ determined that Plaintiff retains the RFC to perform sedentary work, except she can stand/walk in intervals of 30 minutes at a time for a total of 2 hours per day; sit in intervals of 3 hours at a time for a total of 8 hours per day; frequently operate foot controls with the left lower extremity, occasionally operate foot controls with the right lower extremity, and occasionally push and pull with both lower extremities; occasionally balance, stoop, crouch and climb ramps and stairs; never kneel, crawl, or climb ladders, ropes, or scaffolds; must avoid concentrated exposure to extreme cold, extreme heat, wetness, and vibration, and all exposure to hazards including machinery with dangerous moving parts and unprotected heights; requires the use of a cane as needed for ambulation; is able to understand, remember, and carry out detailed but uninvolved written or oral instructions to perform routine and repetitive tasks requiring no more than normal breaks, no frequent changes in the work setting, and occasional interaction with the public, coworkers, and supervisors.  Tr. at 23-24.[5]

---

[5]The ALJ found that Plaintiff's severe substance abuse was not material to the determination of disability, explaining "the record reflects that the combination of [Plaintiff's] impairments support the [RFC] . . . throughout the period of alleged disability independent of any substance abuse."  Tr. at 40.  Despite this finding, I note the ALJ included detailed, specific reference to Plaintiff's substance abuse throughout her opinion.

5

Based on testimony from a vocational expert ("VE"), the ALJ found that Plaintiff is unable to perform her past relevant work as a residential care aide, but that other jobs exist in significant numbers in the national economy that she can perform, such as addressor, final assembler, and table worker. Tr. at 46-47. As a result, the ALJ concluded that Plaintiff is not disabled. Id. at 49.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ (1) violated the Commissioner's policy and due process in having the medical expert testify prior to Plaintiff, and (2) failed to account in her RFC assessment for Plaintiff's moderate limitation in her ability to concentrate, persist, and maintain pace. Docs. 9 & 11. Defendant responds that the ALJ's opinion is supported by substantial evidence. Doc. 10.

### B.    Plaintiff's Claimed Limitations and Testimony Following Remand

Plaintiff was born on July 12, 1980, and thus was 38 years of age at the time of her applications (January 10, 2019) and 41 years of age at the time of the ALJ's decision under review (June 22, 2022). Tr. at 116, 557. She is 5 feet, 5 inches tall and her weight has fluctuated between approximately 240 and 350 pounds. Id. at 562 (Feb. 7, 2019, 240 pounds), 144 (Nov. 6, 2020, 295 pounds), 116 (Nov. 4, 2021, 350 pounds).[6] Plaintiff graduated from high school and received no specialized training, id. at 86, 118, 563, and

---

[6]Plaintiff testified that she considers her "normal" weight to be about 200 pounds, and that she last weighed that amount in 2017 or 2018. Tr. at 117.

has prior work as a resident care aide.  Id. at 85-86.[7]  At the time of the November 2021

administrative hearing, she resided in a house with her fiancé and his sister.  Id. at 118.[8]

At the post-remand hearing on November 4, 2021 hearing, Plaintiff testified that

she had not worked since March 5, 2017, that she underwent a right hip replacement in

2017 followed by orthopedic treatment at Hahnemann, and that Penn Orthopedics told

her in 2018 that she needed a left hip replacement.  Tr. 120-21.  She did not have any

cortisone injections or physical therapy in 2018 or 2019.  Id. at 122.  Plaintiff sees

primary care physicians and a psychiatrist through Project Home, id. at 124, and she

began physical therapy shortly before the hearing and had not noticed any difference.  Id.

at 125.  She has a home health aide who visits seven days per week, five hours per day,

and helps Plaintiff with showering and chores.  Id. at 127-28.

Plaintiff testified that she does not have a driver's license and has not taken public

transportation since March 2017, and that she is driven places by either her fiancé or

home health aide.  Tr. at 117.  She can walk a short distance to the bathroom while

holding furniture, and otherwise requires a cane or walker to ambulate.  Id. at 129.

Plaintiff prefers a walker, which she uses 90% of the time.  Id.[9]  She wears compression

_____

[7]Plaintiff testified that she had prior work experience as counselor's aide at a mother/child residential home.  Tr. at 85-86.  The VE testified that there is no exact code for a counselor's aide and the closest analogous job would be a resident care aide.  Id. at 91.

[8]Plaintiff testified that she has two minor children, who did not reside with her. Tr. at 119.

[9]In a Function Report dated March 15, 2019, Plaintiff indicated that a walker was prescribed by a doctor, in November 2017, and that she uses a cane or walker "sometimes."  Tr. at 574.

socks for edema in her feet.  Id.  She has spoken to Penn Orthopedics about a left hip replacement but needs a place to go afterwards that does not have stairs, explaining that it hurts to climb stairs and she requires the use of a railing, and that she scoots on her butt to go down the stairs.  Id. at 130.  When asked about her mental health issues, Plaintiff stated that she feels useless, and has poor memory and a "depressive state of mind" despite daily medications and monthly telephonic therapy sessions.  Id.[10]  The medications help "[a] little bit," and she is afraid to stop taking them.  Id. at 131.  She is nervous in large crowds, panics when she needs to go to new places or be around people, and is afraid that she will fall or be unable to navigate with her walker.  Id.  She has lost her balance and fallen several times in the last year, and experiences dizziness which she attributes to her medication.  Id. at 131-32.

Plaintiff testified that she uses cocaine and alcohol, that she stopped using fentanyl about one month before the hearing, and that she remains in suboxone treatment at Project Home.  Tr. at 122-24.  She explained that since 2017, her longest periods of sobriety from cocaine and alcohol are six months and eight months, respectively.  Id. at 126.  Plaintiff believes that sobriety makes her physical and mental health issues worse, explaining that she became depressed and experienced more pain and lethargy during

---

[10]Plaintiff identified her psychiatric medications as Seroquel, Wellbutrin, and amitriptyline.  Tr. at 130-31.  Seroquel is an anti-psychotic used to treat schizophrenia and help prevent episodes of depression in patients with bipolar disorder.  See https://www.drugs.com/seroquel.html (last visited June 4, 2025).  Wellbutrin is an anti-depressant.  See https://www.drugs.com/wellbutrin.html (last visited June 4, 2025).  Amitriptyline (marketed as Elavil) is also an antidepressant.  See https://www.drugs.com/amitriptyline.html (last visited June 4, 2025).

periods of abstinence.  Id. at 127.  After completing the questioning of Plaintiff, the ALJ

continued the hearing to allow an orthopedic specialist to be present.  Id. at 133.

At the February 2022 supplemental hearing, the ALJ first took testimony from

Arthur Lorber, M.D., an orthopedic medical expert.  Tr. at 68-84.  Dr. Lorber confirmed

that he reviewed the medical records identified as exhibits 1F through 30F,[11] id. at 69,

after which the ALJ and the doctor had the following exchange:

> [ALJ]  All right, Dr. Lorber, can you please tell me
> based on your review and education, experience, and training
> what are the medically determinable impairments that
> [Plaintiff] has and which ones are severe, please, with
> citations?
> [Dr.]  Before I start that, Your Honor, I'd like you to
> ask [Plaintiff] several questions for clarification, please.
> [ALJ]  What is it that you need to know?
> [Dr.]  What are [Plaintiff's] current medications?
> What assistive device, if any, [Plaintiff] currently uses?  Does
> she drive an automobile?  Has surgery ever been advised to
> her left hip?  Has surgery ever been advised to her lumbar
> spine, and her current weight?
> [ALJ]  Okay.  I want you to just give your testimony
> based on the current record and what you've reviewed what
> we have currently.  So what would you determine are the
> medically determinable impairments without knowing
> whether or not [Plaintiff] is driving or whether surgery has
> been advised?

Id. at 69-70.  After discussing Plaintiff's conditions, Dr. Lorber tried again to obtain

additional information from Plaintiff:

> [ALJ]  . . . .  Okay, and with regard to the severe
> impairments in terms of you mentioned some of the [L]istings
> already, is it your opinion that any of the conditions meet or

---

[11]These exhibits correspond to tr. at 667-3465.  There is no indication in the
transcript of the February 2022 hearing that Dr. Lorber reviewed Plaintiff's November
2021 testimony.

> equal any of the [L]istings?  Particularly, I'm looking at any
> of the orthopedic [L]istings involving the hips or the spine.
>      [Dr.]  That's why I would like you to ask [Plaintiff] a
> question or two so that I could determine the severity.
>      [ALJ]  Okay.  Again, though, I want your testimony
> based on the medical record, so I'm not sure -- you know, I
> want your testimony based on cites to the medical record.  So
> whether or not she's driving, I don't think is part of the
> [L]isting.
>      [Dr.]  What is pertinent, Your Honor, is what kind of
> device, if any, she uses to walk.  That's quite pertinent.

Id. at 73.  The ALJ responded that a 2019 consultative examination noted Plaintiff's use

of a single cane, but did not allow Dr. Lorber to obtain answers to his questions, id., nor

did the ALJ summarize Plaintiff's testimony from the November 2021 hearing.

Regarding his medical record review, Dr. Lorber testified that Plaintiff underwent

a right-side total hip replacement on November 14, 2017, and has degenerative joint

disease ("DJD") in her left hip, as well as a CAM deformity and a ganglion cyst revealed

by a left-side hip MRI performed on October 4, 2017.  Tr. at 70.[12]  The doctor testified

that the record contains no diagnostic or other significant evaluations of Plaintiff's knees.

Id.  Regarding Plaintiff's lumbar spine, Dr. Lorber testified that an MRI also performed

on October 4, 2017, revealed mild degenerative changes at L4-L5 and L5-S1, with no

evidence of significant disc herniation, nerve impingement, or central canal stenosis.  Id.

at 70-71.  The doctor opined that Plaintiff has severe impairments of her bilateral hips,

---

[12]A CAM deformity is an abnormal bony prominence that creates a misshapen
femoral head inside the hip joint, causing impingement and pain.  See
https://pubmed.ncbi.nlm.nih.gov/31613479/ (last visited June 6, 2025).  A ganglion cyst is a
benign, fluid-filled lump commonly associated with a joint or tendon sheath.  Dorland's
Illustrated Medical Dictionary, 33rd edition (2020) ("DIMD"), at 749.

including the femoral head deformity, DJD of the lumbar spine, and obesity, while her reported knee pain and hepatitis C are not medically determinable, and although obstructive sleep apnea is "highly likely" in light of her weight, there is insufficient evidence to determine its existence.  Id. at 71-73.  Dr. Lorber also noted Plaintiff's history of substance abuse, including opioid narcotics, cocaine, heroin, and fentanyl, but stated, "that's not part of my expertise."  Id. at 73.

Dr. Lorber testified that Plaintiff retained the RFC to lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk for 30 minutes at a time and for a total of 2 hours each per day, and sit in intervals of 3 hours and for a total of 8 hours per day; she cannot climb ladders, ropes, or scaffolds, or balance on a beam, but can ambulate on a level surface with the use of a cane; she can occasionally ascend ramps or stairs; she can occasionally stoop and crouch, but cannot kneel or crawl; and she should not be exposed to concentrated vibrations or work around unprotected heights or machinery with dangerous moving parts.  Tr. at 74.  The doctor stated that his assessment of her limitations go back to March 5, 2017, the alleged onset date.  Id. at 75.

When asked specifically about Plaintiff's use of an assistive device, Dr. Lorber explained that the relevant orthopedic Listing required the use of assistive devices held by both hands.  Tr. at 73-74, 83.[13]  The doctor noted that in a March 2019 Function Report, Plaintiff stated that she used both a cane and a walker.  Id. at 83.

---

[13]Dr. Lorber referenced Listing 1.15, titled "Disorders of the skeletal spine resulting in compromise of a nerve root[s]," which among other things requires "[a] documented medical need . . . for a walker, bilateral canes, or bilateral crutches . . . or a wheeled and seated mobility device involving the use of both hands. . . ."  20 C.F.R. pt.

After Dr. Lorber left the hearing, the ALJ proceeded to take further testimony from Plaintiff.  Tr. at 85-90.  Plaintiff described her prior work as a counselor's aide, caring for children and their mothers in a residential home.  Id. at 85.  The work mostly involved standing and walking, with 2 hours of sitting per day and lifting/carrying up to 30 pounds.  Id. at 86-87.  When asked about her current status, Plaintiff again testified that uses a walker more than a cane, which she does not use at all.  Id. at 87.  She described her balance as "horrible," stating that she had fallen three times during the previous month and a half.  Id.  In the most recent incident, Plaintiff explained that she "blacked out and went down" while holding onto the railing and the wall on her way to the bathroom.  Id. at 88.  Her medical provider discontinued amitriptyline after the most recent fall, id. at 89, but she still reports dizziness if she stands up too quickly and she does not trust herself walking without assistance from "somebody or something."  Id. at 90.  Plaintiff testified that she has abstained from opiate use for 3 years, and that periods of sobriety from alcohol and cocaine have not improved her conditions.  Id. at 88.

A VE also testified at the February 2022 supplemental hearing.  Tr. at 90-100.  The VE testified that Plaintiff's past relevant work as a counselor's aide did not have a job classification, and that the most analogous position was that of a resident care aide, classified as medium work.  Id. at 91.  Based on a hypothetical individual of Plaintiff's age, education, and work experience, who was limited to unskilled sedentary work with

---

404, subpt. P, app. 1, Listing 1.15(D)(1).  Language regarding an assistive device using both hands also appears in orthopedic Listings 1.15, 1.16, 1.17, and 1.18, all of which were considered by the ALJ.  Tr. at 20-21.

less restrictive limitations than those ultimately adopted by the ALJ, the VE testified that the individual could perform jobs such as addresser of envelopes, final assembler, and table worker. Id. at 92-93. When the ALJ added additional limitations and presented the VE with a hypothetical incorporating all of the limitations included in her RFC assessment, supra at 5, the VE testified that Plaintiff could perform the same jobs. Id. at 96. If the hypothetical individual were required to elevate her legs for a minimum of 20% per day, the VE testified that it would be considered an accommodation if permitted at all, and that if the individual were off-task 15% or more of the day, full-time gainful employment would be precluded. Id. at 100.

### C.    **Medical Evidence Summary**[14]

Plaintiff has a history of physical conditions including chronic hip and back pain, knee and foot pain, and morbid obesity. Hip x-rays performed on June 8, 2017, revealed severe degenerative changes of her right hip and moderate changes of the left hip consisting of joint space narrowing, subchondral sclerosis, and osteophytes, as well as possible avascular necrosis of the femoral head. Tr. at 704-05. On September 15, 2017, Plaintiff described her right hip pain to be "sharp and aching" and 8/10 -to- 10/10, worsening for years, and that an injection she received in July 2017 provided no relief. Id. at 720. An MRI of her hips performed on October 5, 2017, showed advanced avascular necrosis of the right-hip femoral head with severe secondary osteoarthritis,

---

[14]The medical evidence summary is not comprehensive, but instead focuses on the evidence deemed most relevant to resolution of the issues before the court, particularly Plaintiff's orthopedic issues and her use of assistive devices for ambulation.

moderate osteoarthritis of the left hip with a CAM deformity of the left femoral head

neck junction, strain of the right gluteus minimis and subjacent multiloculated ganglion

cyst, likely related to a prior injury, and mild degenerative changes of the right sacroiliac

joint.  Id. at 707-08.  A lumbar spine MRI performed on the same date showed

degenerative lumbar spondylosis resulting in mild neuroforaminal narrowing at the level

of L4-L5 and L5-S1.  Id. at 706.

On November 14, 2017, Plaintiff underwent a right total hip arthroplasty

performed by Vincent M. Moretti, M.D.  Tr. at 683-86.  Post-surgical imaging showed

status post total right hip arthroplasty in satisfactory position with ongoing moderate

osteoarthritis of the left hip with CAM deformity.  Id. at 687-88.

On January 25, 2018, Plaintiff told substance abuse treatment providers at Project

Home that she continued to have bad knee and hip pain "worse than before surgery."  Tr.

at 1034.  On August 20, 2018, Plaintiff reported that her pain overall seemed to be

worsening, and that she needs to have her left hip replaced as well.  Id. at 1262.  Her pain

worsened with movement, weather, and at night.  Id.  She stated that gabapentin[15] helps

soothe the pain, and she understood that psychological factors and substance use played a

role in her pain.  Id.  On January 17, 2019, Plaintiff reported that she would likely return

to orthopedics for evaluation of her left hip pain.  Id. at 1245.

---

[15]Gabapentin (marketed as Neurontin) is an anticonvulsant used to treat, among
other things, postherpetic nerve pain.  See https://www.drugs.com/gabapentin.html (last
visited June 12, 2025).

On June 24, 2019, Plaintiff appeared for an internal medicine consultative examination with Mark Zibelman, M.D.  Tr. at 1320-24.  Plaintiff reported her history and treatment of arthritis and hip pain, including a growth plate slip in the left hip at age 11, which healed but remains painful, her 2017 right hip replacement, arthritis in both knees which worsens with walking, standing, and climbing stairs, and osteoarthritis of her lower back which pain that waxes and wanes.  Id. at 1320.  She utilized a straight cane, which was medically necessary.  Id. at 1321.  Her current medications included gabapentin and several psychotropic drugs, among others.  Id.  Plaintiff could cook daily and perform childcare as needed, but the pain made it difficult to stand for cleaning, laundry, or shopping.  Id.  Upon examination, she weighed 271 pounds and exhibited antalgic gait, less when using a straight cane.  Id. at 1322.  She could heel and toe walk without difficulty and did not need help changing, getting on or off the table, or rising from a chair.  Id.  Straight-leg tests were negative, both seated and supine.  Id. at 1323.[16] Her strength was 5/5 in the upper and lower extremities, with intact hand and finger dexterity and 5/5 grip strength bilaterally.  Id. at 1323.  Dr. Zibelman diagnosed Plaintiff with osteoarthritis of the knees and hips, low back pain, anxiety, depression, bipolar disorder, post-traumatic stress disorder, morbid obesity, hypothyroidism, and low vision without glasses, and opined that her prognosis was fair.  Id.

---

[16]In the straight-leg raise test, the patient lies supine and the symptomatic leg is lifted with the knee fully extended, and is positive for lumbar radiculopathy if pain is produced between 30 and 90 degrees of elevation, with the distribution of the pain indicative of the nerve root involved.  DIMD at 1871.

Dr. Zibelman also completed an RFC assessment of Plaintiff's ability to perform work-related activities. Tr. at 1325-30. The doctor opined that Plaintiff could lift up to 10 pounds frequently and 20 pounds occasionally, and could carry up to 10 pounds occasionally. Id. at 1325. Without interruption, Plaintiff could sit for 2 hours, stand for 1 hour, and walk for 30 minutes; and in an 8-hour workday, she could sit for 4 hours, stand for 2 hours, and walk for 1 hour, and otherwise rest. Id. at 1326. Plaintiff required the use of a cane to ambulate beyond 75 feet, and could use her free hand to carry small objects while using the cane. Id. Dr. Zibelman opined that Plaintiff could not walk a block at a reasonable pace on rough or uneven surfaces and she could not climb a few steps at a reasonable pace with the use of a single handrail. Id. at 1330.

On July 1, 2019, Project Home providers Christine Castellan, M.D., and Patrick Doggett, M.D., referred Plaintiff to orthopedics for hip pain. Tr. at 1525. Dr. Castellan reported that Plaintiff had been under her care since July 2017, that Plaintiff's hip pain had continued to worsen, that her left hip and back pain is severe, and that she was trying to obtain further evaluation for surgical treatment due to pain. Id. at 1511. Dr. Castellan opined that Plaintiff was currently disabled and could not live in housing that was not accessible to disabled persons. Id.[17]

Also on July 1, 2019, Drs. Castellan and Doggett referred Plaintiff to bariatric surgery to address her morbid obesity. Tr. at 1518. During a bariatric evaluation performed on August 6, 2019, it was noted that Plaintiff had severe osteoarthritis and was

---

[17]Dr. Castellan repeated the same assessment in November 2020, tr. at 2863, and another Project Home provider issued the same opinion in October 2021. Id. at 3391.

due for a determination on left-side hip replacement.  Id. at 2461.  Plaintiff was advised

repeatedly to lose weight and stop smoking.  Id. at 2465-2525.[18]

On July 30, 2019, David Hutz, M.D., reviewed Plaintiff's medical records and

completed a functional assessment as part of the Initial Determination.  Tr. at 165-74,

175-88.   The doctor noted that Plaintiff had severe right hip DJD, persistent right hip

pain through decreased range of motion and multi-level lumbar spine degenerative disc

disease ("DDD"), peripheral neuropathy, thyroid disease, and obesity.  Id. at 172, 183.

Dr. Hutz opined that Plaintiff could perform a limited range of sedentary work and was

not disabled.  Id. at 171-73, 187.

On August 13, 2019, Plaintiff reported to Dr. Castellan that she had knee pain with

some swelling.  Tr. at 1388.  Dr. Castellan assessed Plaintiff with chronic pain syndrome,

obesity, hypothyroidism, and right knee pain.  Id. at 1399.  The doctor continued

Plaintiff's medication regimen, including gabapentin, id. at 1400, and referred Plaintiff to

physical therapy for knee pain.  Id. at 1402.

On September 25, 2019, x-rays were taken of Plaintiff's bilateral knees and hips.

Tr. at 2256.  The knee x-rays showed a small left knee effusion with normal alignment of

the visualized bones and no acute osseous abnormalities.  Id.  The hip x-rays showed

moderate osteoarthritis of the left hip with joint narrowing, subchondral sclerosis,

marginal osteophytes, an osseous prominence of the left femoral head neck junction in

---

[18]On August 13, 2019, Dr. Castellan opined that Plaintiff was "a good candidate
for bariatric surgery" after attempting multiple diet and exercise programs, and taking
several medications, without weight loss success.  Tr. at 1394.  However, Plaintiff did not
undergo a bariatric procedure during the relevant period.

keeping with CAM-type femoral acetabular impingement, and a right hip prosthesis with ossification.  Id.

On October 18, 2019, at the reconsideration level of review, State agency medical consultant Chankun Chung, M.D., concurred with Dr. Hutz that Plaintiff could perform a range of sedentary work and was not disabled.  Tr. at 200-03, 219-20.

On February 21, 2020, Dr. Castellan again referred Plaintiff to orthopedic surgery for evaluation and treatment of osteoarthritis of the left hip.  Tr. at 3220.  However, the only medical evidence of record for the following 6 months concerned Plaintiff's psychiatric treatment at Project Home.  Id. at 2974-3195 (February-August 2020).

On August 27, 2020, Plaintiff sought emergency room treatment at Einstein Medical Center for left foot pain and swelling, which required the use of a walker to get around.  Tr. at 2533, 2545-46.  Following examination and diagnostic studies, id. at 2555-56, Plaintiff was assessed with a chronic calcaneus fracture and advised to keep her foot in a boot for five to seven days while using crutches, and to follow-up with an orthopedist.  Id. at 2549.

On November 11, 2020, Plaintiff sought orthopedic treatment for right hip pain with Christopher Travers, M.D., of Penn Medicine.  Tr. at 2601.  Plaintiff reported pain in her right groin and thigh, 10/10 in severity, worsening with time and exacerbated by activities including walking, standing, stairs, and sleeping.  Id.  She reported a history of bilateral hip conditions, admitted to heroin use, stated that she had gained 100 pounds in the prior 8 months due to a thyroid condition, and weighed 317 pounds at the visit.  Id. at 2601, 2603.  Following examination and review of diagnostic studies, Dr. Travers

assessed her with right hip pain, and advised lab work to rule out an infection.  Id. at

2603.

Also on November 11, 2020, orthopedic expert Richard Jaslow, M.D., completed

medical interrogatories related to Plaintiff's physical impairments.  Tr. at 2584-86.

Following a record review, Dr. Jaslow opined that Plaintiff had severe impairments of

osteoarthritis of the left hip, moderate; morbid obesity; lumbar spondylosis with mild

degenerative changes; and total hip replacement of the right hip.  Id. at 2584.  In a

medical statement of Plaintiff's ability to perform work-related activities (physical), Dr.

Jaslow opined that Plaintiff could lift up to 10 pounds frequently and up to 20 pounds

occasionally, and carry up to 10 pounds occasionally, citing left hip osteoarthritis.  Id. at

2577.  Without interruption, Plaintiff could sit for 3 hours and stand and walk 20 minutes

each, and over an entire 8-hour workday she could sit for 7 hours, stand for 2 hours, and

walk for 1 hour.  Id. at 2578.  Plaintiff required the use of a cane to ambulate and it was

medically necessarily, but she could walk 50 feet without a cane and she could use her

free hand to carry small objects when utilizing a cane.  Id.  Dr. Jaslow opined that

Plaintiff could not walk a block at a reasonable pace on rough or uneven surfaces, but

could perform all other listed activities.  Id. at 2582.

On August 16, 2021, Plaintiff saw physical medicine and rehabilitation provider

Jasmine Zheng, M.D., for evaluation of left lower back pain.  Tr. at 2619.  Plaintiff

reported primary osteoarthritis status post right hip replacement in 2017 with morbid

obesity, hypothyroidism, and depression, as well as constant low back pain and

sometimes right hip pain, rated 8/10, which caused difficulty with daily activities such as

walking and standing.  Id. at 2598.  Plaintiff stated that medications did not help, and that

at home she could walk on her own from the bed to the bathroom, with pain, and without

a cane or walker.  Id.  Upon examination, Dr. Zheng's relevant findings included obesity,

mild tenderness over the left lumbar paraspinals, limited right hip range of motion due to

pain including pain in her groin and right thigh, reduced range of motion in the lumbar

spine, and generalized weakness throughout, with pain.  Id. at 2599.  Dr. Zheng

diagnosed chronic left-sided low back pain without sciatica, significantly reduced spinal

mobility in part due to her obesity, and right hip osteoarthritis and heterotopic

ossification, which the doctor identified as a large source of pain on examination.  Id. at

2600.  The doctor advised Plaintiff to continue pain management and right hip treatment,

consider an MRI and spine injections, and pursue weight loss, aqua therapy, and a TENS

unit.  Id.[19]

On October 22, 2021, Dr. Castellan provided a physical RFC assessment.  Tr. at

2629-32.  The doctor noted that Plaintiff had osteoarthritis of the hip, severe obesity with

comorbidity, other chronic pain, and right knee osteoarthritis.  Id. at 2629.  Dr. Castellan

explained that her symptoms had been persistent and worsening since 2013 and that

conservative treatment and anti-inflammatories had not been effective.  Id. at 2632.  Dr.

Castellan opined the Plaintiff could sit or stand/walk each less than 2 hours in an 8-hour

workday, required a sit/stand option at will and unscheduled breaks, could never lift or

---

[19]TENS is the acronym for transcutaneous electrical nerve stimulation, and a
TENS unit uses electrical nerve stimulation as a treatment for pain.  See
https://www.drugs.com/cg/how-to-use-a-tens-unit.html (last visited June 14, 2025).

carry any weight, and could never crouch, stoop, twist, climb stairs, or kneel.  Id. at 2629-30.  Dr. Castellan opined that Plaintiff's prognosis was poor, citing her severe left-hip osteoarthritis and continued follow-up with orthopedic surgery.  Id. at 2632.

On October 25, 2021, on referral from Dr. Castellan, a physical therapist evaluated Plaintiff for treatment of bilateral hip and back pain.  Tr. at 2623-27.  Plaintiff reported everything made her back hurt, with pain ranging from 5/10 to 10/10.  Id. at 2623.  She navigates 6 steps at home, 1 foot at a time, and fell twice in the past year.  Id.  Upon examination, Plaintiff exhibited an antalgic gait with no assistive device, restricted range of motion, and decreased strength, and she could not stand for long and exhibited instability during prolonged balance testing.  Id. at 2625.

On February 17, 2022, Joi Goodwin, FNP-BC, provided an RFC assessment.  Tr. at 3462-65.  Ms. Goodwin opined that Plaintiff could sit and stand/walk less than 2 hours each in an 8-hour working day, id. at 3462, and could frequently lift or carry less than 10 pounds but never 10 pounds or more.  Id. at 3464.  She required a sit/stand/walk option at will and unscheduled breaks.  Id. at 3462.  Her impairments would result in good days and bad days, and she would have likely be absent more than 4 days per month.  Id. at 3463.

### D.   **Plaintiff's Claims**

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ heard testimony from the medical expert, Dr. Lorber, before Plaintiff's testimony, thus violating provision I-2-6-70 of the Commissioner's Hearings, Appeals

and Litigation Law Manual ("HALLEX").  Doc. 9 at 6, 8-9; Doc. 11 at 2.[20]  Defendant

counters that the ALJ's violation of a HALLEX provision does not constitute error

warranting remand.

Here, as previously summarized, supra at 9-11, Dr. Lorber testified as an

orthopedic expert at Plaintiff's second hearing on remand, doing so before Plaintiff

testified at the same hearing.  The ALJ did not allow the doctor to obtain specific

information that he considered necessary to inform his testimony, including whether

Plaintiff used any assistive device, whether she drove, whether surgery had been

recommended on her left hip or lumbar spine, and her current weight.  The ALJ also did

not summarize Plaintiff's testimony from the first hearing on remand or give Dr. Lorber a

copy of the transcript from that hearing, other than to say that a 2019 consultative

examination noted Plaintiff's use of a single cane.  There appears to be no dispute that the

ALJ's actions violates HALLEX.  The key issue, therefore, is whether the violation

necessitates remand.

Plaintiff identifies two federal cases in support of the proposition that the violation

of HALLEX I-2-6-70(B) compels remand -- Steele v. Saul, 520 F.Supp.3d 1198 (D.

Alaska 2021), and Quick v. Saul, 520 F.Supp.3d 1190 (D. Alaska 2021).  See Doc. 9 at 6.

---

[20]Specifically, Plaintiff argues that the ALJ violated the HALLEX provision
governing the testimony of a medical expert, which directs the ALJ to summarize
pertinent testimony for a medical expert who did not hear the testimony or, "[i]f
additional medical evidence is received at the hearing, the ALJ will provide it to the
[medical expert] for review before the ME testifies."  HALLEX I-2-6-70(B),
https://secure.ssa.gov/apps10/poms.nsf/lnx/2501260070 (last visited June 16, 2025).  The
Social Security website notes that the provision has been renumbered HA 01360.070, but
I will use the HALLEX citation adopted by the parties.

In both cases, the Honorable H. Russel Holland held that the ALJ's failure to comply with HALLEX I-2-6-70(B) constituted error and remanded.  Steele, 520 F.Supp.3d at 1208; Quick, 520 F.Supp.3d at 1197.  However, Plaintiff erroneously characterizes these cases as "controlling."  Doc. 9 at 6.  To the contrary, as Defendant correctly point out, the Third Circuit has explicitly held that the Commissioner's internal manuals, as such as the HALLEX, "do not have the force of law and create no judicially-enforceable rights." Bordes v. Comm'r of Soc. Sec., 235 F. App'x 853, 859 (3d Cir. 2007) (citing Schweiker v. Hansen, 450 U.S. 785, 789 (1981)); see also Barlow-Ahsan v. Kijikazi, Civil No. 21-2220, 2023 WL 6847559, at *5 (E.D. Pa. Oct. 17, 2023) ("HALLEX guidelines are not binding on the Commissioner and do not have the force of law.").  Therefore, the ALJ's violation of HALLEX, by itself, does not warrant remand.

However, Plaintiff does not only rely on HALLEX, but also argues that the ALJ violated Plaintiff's right to a fair hearing, resulting in prejudice.  Doc. 9 at 6, 8-9; Doc. 11 at 2.[21]  The Supreme Court has held that due process applies to adjudicative proceedings before the Social Security Administration.  Richardson v. Perales, 402 U.S. 389, 401 (1971) (procedural due process applies to adjudicative administrative proceedings); Ventura v. Shalala, 55 F.3d 900, 902 (3d Cir. 1995) (although Social Security hearings are informal, "due process requires that any hearing afforded claimant be full and fair").

---

[21]Defendant argues that to the extent Plaintiff contends that her due process rights were violated, such a claim is not developed in her brief and is therefore waived.  Doc. 10 at 6.  Although Plaintiff's argument on this point is limited, she explicitly invokes "due process" and articulates the proposition supported by case citations, and I conclude that she has adequately raised a due process issue.

Thus, "[b]efore this Court is free to determine whether an administrative decision is supported by substantial evidence, 'the Court must first be satisfied that the plaintiff has had a full and fair hearing under the regulations of the Social Security Administration and in accordance with the beneficent purposes of the act.'" Holmes v. Barnhart, Civ. No. 04-5765, 2007 WL 951637, at *7 (E.D. Pa. Mar. 26, 2007) (quoting Maniaci v. Apfel, 27 F. Supp.2d 554, 556 (E.D. Pa. 1998)). Indeed, "the Social Security Act and its corresponding regulations provide for fair procedures." Ventura, 55 F.3d at 902 (citing Hess v. Sec'y of Health, Educ. & Welfare, 497 F.2d 837, 840-41 (3d Cir. 1974); Rosa v. Bowen, 677 F. Supp. 782, 783 (D.N.J. 1988)).

The Supreme Court has also made clear that "Social Security proceedings are inquisitorial rather than adversarial." Sims v. Apfel, 530 U.S. 103, 110-11 (2000). Therefore, at an administrative hearing "[i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." Id. at 111; see also Ventura, 55 F.3d at 902 ("The due process requirement of an impartial decisionmaker is applied more strictly in administrative proceedings than in court proceedings because of the absence of procedural safeguards normally available in judicial proceedings.") (citing Hummel v. Heckler, 736 F.2d 91, 93 (3d Cir. 1984)). "[T]he Third Circuit 'has repeatedly emphasized that the special nature of proceedings for disability benefits dictates extra care on the part of the agency in developing an administrative record'" and in considering all the evidence. Rosa v. Colvin, 956 F. Supp.2d 617, 621 (E.D. Pa. June 28, 2013) (quoting Dobrowolsky v. Califano, 606 F.2d 403, 406-07 (3d Cir. 1979)).

24

Due process claims in the Social Security context arise from a variety of allegedly unfair actions that occur during the administration process, including instances that compel the court to base a decision on "the conduct of the hearing, not the content of the evidence." <u>Ventura</u>, 55 F.3d at 901. For example, in <u>Ventura</u>, the Third Circuit held that the ALJ's repeated interruption of the claimant and his lay representative demonstrated offensive and unprofessional conduct, and constituted coercive and intimidating questioning that deprived the claimant of a full and fair hearing. <u>Id.</u> at 902-05. Due process violations have also been found in the absence of bias or misconduct. <u>See</u>, <u>e.g.</u>, <u>Hess</u>, 497 F.2d at 841 (ALJ's failure to secure "readily obtainable information" to resolve doubts about entitlement to disability benefits deprived unrepresented claimant of a fair hearing).

Additionally, principles of fairness akin to due process have informed the decisions of courts in this district and elsewhere to remand for lack of substantial evidence. For example, where the ALJ did not credit the plaintiff's testimony about the impact of her hearing loss, but refused to hear testimony from the plaintiff's boyfriend on that same issue, the court considered that the plaintiff was denied a full and fair hearing. <u>Stephens v. Comm'r of Soc. Sec. Admin</u>, Civ. No. 09-2394, 2010 WL 2546027, at *3-4 (D.N.J. June 21, 2010). "Perhaps the ALJ would not have credited this testimony for the same reason he did not credit Plaintiff's testimony, but this is not a sufficient basis to reject the testimony before hearing it." <u>Id.</u> at *4; <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Statile v. Comm'r of Soc. Sec.</u>, Civ. No. 21-5193, 2023 WL 6587930 (E.D.N.Y. Oct. 10, 2023) (remanding where ALJ had medical expert testify by telephone and did not give him the chance to hear

plaintiff's testimony, noting "[a] medical opinion in which the medical expert is deliberately isolated from contact with the claimant naturally dilutes its persuasive force"); Soli v. Astrue, Civ. No. 08-3483, 2010 WL 2927651, at *6 (E.D. Pa. Mar. 15, 2010) (remanding where ALJ took testimony from a medical expert who did not have the benefit of plaintiff's medical records for the entire pertinent time period, and who therefore "could not render a full and adequate medical opinion"). The guiding principle in each of these decisions is the right to a full and fair administrative process.

Here, the ALJ's refusal to allow Dr. Lorber to obtain the answers to his questions is particularly unfair to Plaintiff because the information the doctor sought was directly relevant to the reason he was at the hearing -- to testify about Plaintiff's orthopedic conditions and limitations. The ALJ stated that she wanted Dr. Lorber to give his testimony "based on the current record," tr. at 69, and the ALJ asked for the doctor's opinion as to whether any of Plaintiff's "conditions meet or equal any of the [L]istings." Id. at 73. The ALJ's verbiage in both instances is present tense, which can be fairly understood (and was apparently understood by Dr. Lorber) to include Plaintiff's conditions and limitations *at the time of the hearing*. By limiting Dr. Lorber to a record review and denying him the opportunity to update those records with first-hand, contemporaneous answers to his questions, the ALJ prevented the doctor from obtaining potentially crucial updated evidence. [22]

---

[22]The ALJ was correct to inquire into Plaintiff's current limitations, because this case does not concern a closed period of disability. Rather, the case involves both DIB and SSI applications, thus extending the relevant timeframe beyond Plaintiff's September 30, 2017 date last insured.

Plaintiff's diagnosed physical impairments of obesity, lumbar pain, and bilateral hip, knee and foot pain, all of which the ALJ found to be severe, combined with her treating physician's statement that Plaintiff's pain has been persistent and worsening since 2013 despite treatment, id. at 2632, adds to the reasonableness of the information sought by Dr. Lorber, and underscores the extent to which Plaintiff was deprived of a full and fair hearing.  Moreover, the ALJ's refusal to allow the questioning sought by Dr. Lorber strongly suggests that the ALJ had already made up her mind before hearing Plaintiff's testimony, whereas the testifying medical expert had neither heard Plaintiff's testimony nor opined on Plaintiff's limitations; and this, in turn, undermines the principle that claimants are entitled to a "full and fair hearing . . . in accordance with the beneficent purposes of the act."  Maniaci, 27 F.Supp.2d at 556.  The ALJ's refusal is particularly problematic in the context of this case, which had already been remanded by the Appeals Council because the first ALJ had violated a HALLEX provision regarding Plaintiff's right to confront and/or cross-examine the original medical expert.  Tr. at 250-51.

For these reasons, I find that the ALJ did not afford Plaintiff a full and fair hearing in this non-adversarial Social Security proceeding, and that the matter must be remanded.[23]

---

[23]Because I remand on Plaintiff's first ground, I do not find it necessary at this time to address Plaintiff's second claim concerning the RFC in light of the limitations in Plaintiff's ability to concentrate persist, and maintain pace.  However, I note that on remand, the ALJ is to again consider all of Plaintiff's physical and mental impairments, and to incorporate all limitations therefrom, when assessing her RFC.

Furthermore, the ALJ repeatedly noted in her opinion that Plaintiff failed to seek or follow through on treatment for various conditions during the relevant period, without investigating whether such failures were attributable to the housing, financial or

## IV.    <u>CONCLUSION</u>

The ALJ prevented a testifying medical expert from providing fully informed testimony and thereby deprived Plaintiff of a full and fair hearing in violation of her due process rights.  Upon remand, the ALJ shall obtain additional medical expert testimony, if deemed necessary, and afford the expert the opportunity to inquire as to any matters the expert deems appropriate and necessary to provide fully-informed testimony.

An appropriate Order follows.

---

insurance difficulties referenced in the record, or whether such failures could be attributed to Plaintiff's mental health impairments which the ALJ found to be severe. The ALJ is advised to address these issues on remand, if deemed necessary.